790 A.2d 15

**Clarence CONYERS, Jr.,**

v.

**STATE of Maryland.**

**No. 26, Sept. Term, 2001.**

Court of Appeals of Maryland.

Feb. 5, 2002.

575

Robert W. Biddle (Bennett & Nathans, LLP, Baltimore; Nancy M. Cohen, Towson), on brief, for appellant.

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for appellee.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

HARRELL, Judge.

This is an appeal by Clarence Conyers, Jr. (Petitioner) from the denial by the Circuit Court for Wicomico County of post conviction relief in his capital case.[1] *See* Maryland Code (1957, 1996 Repl.Vol., 2000 Supp.), Article 27, §§ 645A–J (Maryland's Uniform Post Conviction Procedure Act),[2] and Maryland Rules 4–401 through 4–408,[3] and 8–306.[4] This is the third time Petitioner has sought this Court's review regarding the convictions and sentences in this matter.

In January 1996, following a jury trial in the Circuit Court for Wicomico County, Petitioner was convicted, with respect to the victim, Wanda Johnson, of premeditated murder, felony murder, first-degree burglary, robbery with a deadly weapon, attempted robbery with a deadly weapon, robbery, attempted robbery, and use of a handgun in the commission of a crime of

1. The petition for post conviction relief arose out of *State v. Conyers*, Case Nos. 96CR0458 and 96CR0460 in the Circuit Court for Wicomico County. Charges were filed originally against Petitioner in the Circuit Court for Baltimore County because the murders occurred in Baltimore County. The case was transferred to the Circuit Court for Wicomico County for trial.

2. Maryland's Uniform Post Conviction Procedure Act, Maryland Code (1957, 1996 Repl.Vol., 2000 Supp.), Article 27, §§ 645A–J, provides for and regulates the post conviction proceedings of certain persons who have been convicted of crimes.

3. Maryland Rules 4–401 through 4–408 specify the procedures to petition for post conviction relief.

4. Maryland Rule 8–306 applies to appellate review in the Court of Appeals in capital cases, including application for leave to appeal from a judgment granting or denying relief in a post conviction proceeding.

violence. In the same proceeding, Petitioner was convicted of premeditated murder of, and use of a handgun in the commission of a felony against Lawrence Bradshaw, his alleged accomplice in the crimes against Ms. Johnson. The same jury sentenced Petitioner to death for the murder of Ms. Johnson.[5] Petitioner received life without possibility of parole for the murder of Lawrence Bradshaw.[6]

In the initial direct appeal, this Court reversed the burglary conviction, affirmed the murder and other convictions, and vacated the death sentence, finding with regard to the latter that the trial court committed reversible error in admitting a portion of the pre-sentence investigation report referring to Petitioner's prior juvenile charges that had not resulted in a finding of delinquency. *See Conyers v. State,* 345 Md. 525, 575, 693 A.2d 781, 805 (1997) (*"Conyers I "*). The case was remanded to the Circuit Court for Wicomico County for a new sentencing proceeding relating solely to the murder of Ms. Johnson.

In January 1998, a new capital sentencing proceeding was conducted before a jury in the Circuit Court for Wicomico County.[7] Petitioner, represented by different trial counsel, was sentenced again to death for the murder of Wanda

---

**5.** Pursuant to the provisions of Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 413 (concerning the sentencing procedure upon a finding of guilty of first degree murder), the jury found, beyond a reasonable doubt, that Petitioner was a principal in the first degree in the murder of Ms. Johnson, and that the murder was perpetrated in the course of committing or attempting to commit a robbery. At least one or more, but fewer than all, of the jurors found, by a preponderance of the evidence, the existence of two non-statutory mitigating circumstances, specifically, family ties and a loving family. Finding, by a preponderance of the evidence, that the aggravating circumstance outweighed the mitigating circumstances, the jury unanimously determined the sentence to be death.

**6.** The State did not seek the death penalty for the murder of Mr. Bradshaw.

**7.** Unless indicated otherwise, all further references to the sentencing proceeding in this opinion will be to the second sentencing proceeding in January 1998.

Johnson.[8]   On the second direct appeal, this Court affirmed. *See Conyers v. State,* 354 Md. 132, 200, 729 A.2d 910, 946, *cert. denied,* 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999) (*"Conyers II"*).   The U.S. Supreme Court denied further review.   *See Conyers v. Maryland,* 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999).

On 7 March 2000, pursuant with the provisions of Maryland's Uniform Post Conviction Procedure Act, Md.Code (1957, 1996 Repl.Vol., 2000 Supp.), Art. 27, §§ 645 A–J and Md. Rules 4–401 through 4–408, and 8–306, Petitioner, through yet different trial counsel, filed a petition for post conviction relief[9] in the Circuit Court for Wicomico County, alleging, among other things, due process violations, ineffective assistance of counsel, and various trial court errors. After an evidentiary hearing, the Circuit Court[10] denied Petitioner post conviction relief by an Order dated 30 January 2001.   The court found Petitioner's allegations of due process violations unsupported by the evidence.   As to the ineffective assistance of counsel claim, the court concluded Petitioner's assertions were without merit.   The court dismissed Petitioner's contentions of trial and sentencing court errors, finding the actions to be proper.   Finally, the court rejected Petitioner's challenges to Maryland's death penalty procedure and method of execution.

---

**8.**   In accordance with the provisions of Md.Code (1957, 1996 Repl.Vol., 1998 Supp.) Art. 27, § 413, the jury found, beyond a reasonable doubt, that Petitioner was a principal in the first degree in the murder of Ms. Johnson and that the murder was committed in the course of committing or attempting to commit a robbery.   The jury did not find, by a preponderance of the evidence, the existence of any mitigating circumstances.   The jury unanimously sentenced Petitioner to death.

**9.**   Supplemental amended petitions were later filed.   For purposes of this Opinion, the original and amended petitions will be considered as a whole and collectively referred to as "petition."

**10.**   Although the same judge presided over all trial court proceedings prior to the filing of the post conviction petition, a visiting judge presided over the post conviction proceedings.

On 28 February 2001, pursuant to the provisions of Md. Code (1957, 1996 Repl.Vol.), Art. 27, § 645–I and Md. Rule 8–306, Petitioner filed with this Court an application for leave to appeal denial of post conviction relief. The application was granted on 11 May 2001. We shall reverse the Circuit Court's denial of Petitioner's petition for post conviction relief and remand this case to the Circuit Court for Wicomico County for a new trial.

## Factual Background

Prior to the recitation of the issues presented for our consideration here, we set out the underlying facts regarding Petitioner's convictions, as recounted by the post conviction hearing judge.[11]

At approximately 9:35 p.m., on Friday, October 21, 1994, Petitioner's estranged girlfriend, Monica Wilson, went to visit her mother, Wanda Johnson, at the home Ms. Johnson shared with her husband, Elwood Johnson. Ms. Wilson had just spoken with her mother at 9:00 p.m. that evening, and her mother had agreed to babysit for Ms. Wilson's son. Arriving with Ms. Wilson at the Johnson home was her cousin, Carla Clinton.

As the two women approached the Johnson home, they saw someone looking outside through a second floor bedroom window. The women knocked on the door, and, as they waited for someone to open it, they saw through a window a man walking down the stairs. The women saw this man turn off the lights inside the house and duck down as if to avoid being seen. The two women walked to a back door and knocked on it. The women heard sounds of a struggle, described as a "commotion," "tussling" and "fighting," coming from inside the house. Then Ms. Johnson

---

11. The statement of facts concerning the crime and subsequent events recounted in the post conviction court's Memorandum Opinion was taken from *Conyers v. State*, 354 Md. 132, 143–47, 729 A.2d 910, 915–18, *cert. denied*, 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999) (*"Conyers II"*).

began to scream, and a window on the second floor broke over the women's heads.

The two women fled to the home of a relative who lived nearby and called the police. On the way to the relative's house, Ms. Wilson noticed a car parked across the street from her mother's house. The car resembled one that Petitioner sometimes borrowed from his former girlfriend and mother of his child, Debra Meyers. Upon returning to the Johnson home, Ms. Wilson was informed by the police that her mother was dead.

There were no signs of forced entry into the Johnson home. Wanda Johnson's body was found in the master bedroom. She had been shot three times in the head, once in the back, and once in the arm. It was Ms. Johnson's custom to keep a small amount of money in her wallet. Furthermore, when Ms. Wilson spoke to Ms. Johnson earlier that evening, at approximately 9:00 p.m., Ms. Johnson said that she had twenty dollars. Ms. Johnson's open wallet was found atop her dresser in the master bedroom; there was no money in the wallet. In the den, a door to a closet had been forced open, revealing a safe. The closet door had a hasp and a lock on it for security, but the hasp and lock had been pried out of the door jamb to gain access to the closet. Pulling the hasp out of the door jamb had caused splinters to fall on the floor around the closet. The safe inside the closet was closed. Mr. Johnson opened the safe the day after his wife's murder; it contained fifteen dollars.

The next day, Ms. Clinton worked with a police artist on a sketch of the man she had seen on the staircase inside the Johnson home the evening before. Ms. Wilson was asked to look at the sketch that had been made based on Ms. Clinton's description. Petitioner, who had come to the police station to keep Ms. Wilson company, took the sketch away before Ms. Wilson had a chance to see it, telling the police that the sketch would upset her. When Ms. Wilson finally had a chance to see the police sketch, she did not immediately identify Lawrence Bradshaw as the man depicted in the sketch. She made a photo identification of

another man, who was arrested and incarcerated for a brief time as a result. Ms. Wilson later agreed, however, that the police sketch looked like Lawrence Bradshaw.

Shortly after 1:00 a.m. on October 23, 1994, approximately 27 hours after the murder of Ms. Johnson, Lawrence Bradshaw was shot in the 4300 block of McDowell Lane. This street is located in the Lansdowne area, near Debra Meyers's home. Mr. Bradshaw had been shot three times in the head, once in the back, once in the arm, and once in the finger. Mr. Bradshaw was taken to Shock Trauma, where he died the following day. *Conyers I,* 345 Md. at 534–36, 693 A.2d at 785–86.

As to Johnson, Petitioner was convicted of premeditated murder, felony murder, first-degree burglary, robbery with a deadly weapon, attempted robbery with a deadly weapon, robbery, attempted robbery, and use of a handgun in the commission of a crime of violence, and sentenced to death. With respect to Bradshaw, Petitioner was found guilty of premeditated murder and use of a handgun in the commission of a crime of violence, and sentenced to life without parole.

On appeal, the Court of Appeals found the evidence was insufficient to sustain Petitioner's conviction for the burglary of Johnson's home, but sustained the remaining convictions. Regarding sentencing, the Court of Appeals held that certain portions of Petitioner's juvenile record that were contained in the pre-sentence investigation (PSI) report should not have been presented to the jury because the material was considered "inflammatory and highly prejudicial." *Conyers I,* 345 Md. at 563, 693 A.2d at 799. Consequently, Petitioner was granted a new sentencing hearing.

At the second capital sentencing hearing,[12] during the State's case, Charles Johnson (no relation to the victim, Wanda Johnson, or her husband) testified that while he was

12. Charles Johnson's testimony during the sentencing stage was essentially a reiteration of his earlier testimony given during the guilt/innocence phase of Petitioner's January 1996 trial.

Petitioner's cellmate [13] at the Baltimore County Detention Center in October–November of 1994, Petitioner discussed the robbery at [Wanda] Johnson's home. Charles Johnson stated Petitioner told him that he and a person named "Molek" [14] went to Wanda Johnson's house and Petitioner went upstairs to rob a safe. Charles Johnson testified:

> "During the robbery, someone came to the door. At that point, Ms. Johnson yelled out ... her daughter's name or something of that nature. And Clarence panicked, because, I guess, they would recognize him is what he said, and as a result, he wound up shooting Ms. Johnson."

Charles Johnson went on to state that Petitioner told him that while both he and "Molek" were upstairs at first, when they heard noise, "Molek" ran downstairs. After [Wanda] Johnson was shot, "Molek" ran but Petitioner waited until no one was outside before he left.

Wanda Johnson's husband, Elwood Johnson, testified that Petitioner was a frequent visitor to their home. He also described the layout of the home, providing specific details about a spare bedroom that contained a safe in a closet. The safe, which contained personal papers and petty cash, had a combination lock and the closet was secured with a lock and hasp. Mr. [Elwood] Johnson stated that earlier in the day, the safe and closet were in normal condition but when he returned after the shooting the closet had been forced open and the hasp was broken. Furthermore, his wife's wallet was lying open on a dresser in their bedroom, which normally would have been inside her purse and placed in a cabinet or dresser drawer.

---

13. Charles Johnson was awaiting trial on charges of armed robbery of a Wendy's Restaurant at the time he was Petitioner's cellmate.

14. Debra Meyers, Petitioner's former girlfriend and the mother of his child, testified during the guilt/innocence phase of the January 1996 trial that Mr. Bradshaw was introduced to her as "Molek" by Petitioner upon arriving at her home in the early morning hours of 23 October 1994, shortly before Mr. Bradshaw was shot.

Wilson, the victim's daughter, basically recapped her trial testimony, describing her past relationship with Petitioner, her arrival at her mother's home with her cousin and son, hearing noise and her mother's screams, fleeing the scene and going for help down the street, and finally being informed of her mother's murder. Wilson also testified to Petitioner's efforts to prevent her from seeing the composite sketch of Bradshaw that her cousin helped develop and to keep her from reading or viewing any news related to the murder. Wilson stated Petitioner knew about the safe in her parents' spare bedroom and that he was aware her mother was not normally home on Friday evenings. Wilson knew that Petitioner owned a .38 caliber pistol, the type of weapon used to kill her mother.

Carla Clinton, Wilson's cousin who was with her at the crime scene, also repeated her trial testimony as to going to the Johnson house, seeing someone downstairs, hearing noise and her aunt's screams from inside the house, and finally assisting the police in the development of a composite sketch of the person she saw in the house.

Also during the State's case, a stipulation was presented to the jury regarding the recovered cartridges and the fact that they were all fired from a .38 caliber handgun. In addition, Victoria Gibson, the victim's sister, testified as a victim impact witness, describing her sister's nature and personality and the warm relationship she had with her entire family. Furthermore, Petitioner's PSI report, which was redacted to the satisfaction of both the State and defense, was introduced into evidence.

During the defense's case, Arthur Rogers testified that he was incarcerated with Charles Johnson during October 1994 and at one point he discovered Johnson "rifling through my charging documents." Ventura McLee testified that he was incarcerated in October 1994 with Petitioner and Charles Johnson. During this period, Charles Johnson showed McLee indictment papers, police reports, and photographs relating to Petitioner's case. Timothy Wren testified that while he was incarcerated with Charles Johnson during

August and October 1994, Charles Johnson told him that he had seen Petitioner's charge papers, that he had heard Petitioner talk about the case in his sleep, and that Petitioner had confessed his guilt. Eric Spencer, who resided in the cell next to Charles Johnson and Petitioner in October 1994, testified that he never heard Petitioner discussing his case with Charles Johnson.

Testifying as mitigation witnesses were Petitioner's parents, Clarence Conyers, Sr., and Eleanor Conyers, as well as Reverend William Felder. Petitioner exercised his right of allocution, stating that he "had no involvement in this crime whatsoever."

Additional facts will be provided as relevant to the respective issues we shall consider.

## Petitioner's Issues

Petitioner asserts two instances of prosecutorial misconduct based upon the State's failure to disclose material impeachment evidence, that he was entitled to receive, concerning an important State's witness,[15] Charles Johnson (no relation to the victim, Wanda Johnson). First, Petitioner contends that the State failed to disclose, at trial or sentencing, evidence that Johnson sought a benefit relative to a pending charge when he met with police on 23 November 1994,[16] at which meeting he provided incriminating information on Petitioner. Moreover, Petitioner asserts, the State persisted in its deception regarding the complete circumstances surrounding Charles Johnson's coming forward by presenting at sentencing, without correction, the false testimony of Johnson, and corroborating testimony of Detective Phillip Marll, regarding the absence of such solicitation by Johnson, and then misled

---

15. Charles Johnson was the State's key witness in the sentencing proceeding regarding Petitioner's principalship in the murder of Ms. Johnson.

16. Charles Johnson met with police for the first, and only, time on 23 November 1994. The meeting was held at Johnson's request. Detectives Phillip Marll and James Tincher conducted the police interview.

the jury in its closing arguments concerning Johnson's unselfish motives in coming forward and his credibility as a witness. Second, Petitioner contends that the State failed to provide documentation contained in its files of unsuccessful efforts by the police to verify the accuracy of a number of statements Johnson provided the police during the 23 November 1994 meeting, and instead offered Detective Marll's false testimony at sentencing that the police had verified "each and every" statement made by Johnson.[17]

Petitioner argues that the lack of disclosure, aggravated by the presentation of false testimony, in each instance, was a violation of Petitioner's due process rights under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny.[18] Petitioner also asserts an ineffective assistance of counsel claim citing numerous instances of deficiencies of trial and sentencing counsel, trial court error, and additional claims of error. Petitioner presents a total of nineteen (19) questions for our review.[19] We have consolidated them into fourteen (14) questions, grouped according to whether they pertain to the guilt/innocence phase, the sentencing proceeding, or the post conviction hearing.

---

**17.** The State emphasized in its closing argument at sentencing that "all" of Johnson's statements had been verified by the police.

**18.** We shall refer to this in the opinion as the *"Brady* claims." In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d 215.

**19.** Ordinarily, we would simply repeat the questions presented or arguments in Petitioner's brief. We are unable to do that here, with complete confidence, because Petitioner framed the issues in a most confusing way. In Petitioner's brief, in the Table of Contents, he frames arguments, numbered one (1) through twelve (12), some with subparts (a total of nine (9) subparts, two (2) of which have three (3) sub-subparts each). In the main body of the brief, however, he frames nineteen (19) Questions Presented. For clarity of presentation in this opinion, we express our understanding of a melding of Petitioner's issues.

Guilt/Innocence Phase Errors

I      Did the post conviction court err in finding that the State did not deny Petitioner due process in the guilt/innocence phase of trial by withholding certain material, impeachment evidence pertaining to the testimony of its key witness, Charles Johnson, in conjunction with the presentation of false testimony by and about Charles Johnson relative to such evidence, along with the State's misleading closing arguments commending Mr. Johnson's credibility, in violation of *Brady?*

II     Did the post conviction court err in concluding that Petitioner was not denied the effective assistance of counsel at the guilt/innocence phase of trial with respect to the testimony of Charles Johnson?

III    Did the post conviction court err in concluding Petitioner was in no other respect deprived of the effective assistance of counsel at the guilt/innocence phase of trial?

IV    Did the post conviction court err in finding that Petitioner suffered no prejudice from the omission of certain jury instructions at the guilt/innocence phase of trial?

V     Did the post conviction court err in finding that cumulative ineffective assistance of counsel error does not require a new trial?

VI    Did the Circuit Court properly deny Petitioner's claim that the State's summations at the guilt/innocence phase of trial violated due process where the State implied in the trial summation that the jurors should be afraid of Petitioner?

VII   Should this Court consider three claims denied by the post conviction court, which were included solely to preserve the record for future federal review?

Sentencing Errors

VIII Did the post conviction court err in finding that the State did not deny Petitioner due process at sentencing by withholding certain material, impeachment evidence pertaining to the testimony of its key witness, Charles Johnson, in conjunction with the presentation of false testimony by and about Charles Johnson relative to such evidence, along with the State's misleading closing arguments commending Mr. Johnson's credibility, in violation of *Brady?*

IX Did the post conviction court err in concluding that Petitioner was not denied the effective assistance of counsel at sentencing with respect to the testimony of Charles Johnson?

X Did the post conviction court err in concluding Petitioner was in no other respect deprived of the effective assistance of counsel at sentencing?

XI Did the post conviction court err in finding that the sentencing form properly consolidated the jury's finding regarding the robbery and attempted robbery aggravators into one item where the evidence of the robbery predicate was legally sufficient to find the defendant guilty?

XII Did the post conviction court err in finding that the Supreme Court's recent holding in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), had no applicability to the present case?

XIII Did the post conviction court err in finding that cumulative ineffective assistance of counsel error does not require a new sentencing?

Post Conviction Error

XIV Did the post conviction court improperly quash Petitioner's subpoena to the Department of Corrections to obtain testimony and documents pertaining to methods of execution where such subpoena was essential to proving that Maryland's lethal injection

method of execution is cruel and unusual punishment violative of the Eighth Amendment?

## *The State's Waiver Argument*

As a preliminary matter, the State asserts that, pursuant to the provisions of Md.Code (1957, 1996 Repl.Vol., 2000 Supp.), Art. 27, § 645A(c)(2),[20] Petitioner's *Brady* claims (I and VIII) were waived, having been raised for the first time in the post conviction proceeding. Petitioner counters that, in fact, it is the State's waiver argument that has been waived in accordance with Md. Rule 8–131(a),[21] as it was not presented to the Circuit Court during the post conviction proceedings, and, accordingly, was not addressed by the hearing judge in his opinion of 30 January 2001. Moreover, Petitioner asserts the

---

**20.** Article 27, § 645A(c) concerns matters of waiver under Maryland's Uniform Post Conviction Procedure Act, and provides that:

(c) *When allegation of error deemed to have been waived.*—(1) For the purposes of this subtitle, an allegation of error shall be deemed to be waived when a petitioner could have made, but intelligently and knowingly failed to make, such allegation before trial, at trial, on direct appeal (whether or not the petitioner actually took such an appeal), in an application for leave to appeal a conviction based on a guilty plea, in any habeas corpus or coram nobis proceeding actually instituted by said petitioner, in a prior petition under this subtitle, or in any other proceeding actually instituted by said petitioner, unless the failure to make such allegation shall be excused because of special circumstances. The burden of proving the existence of such special circumstances shall be upon the petitioner.
(2) When an allegation of error could have been made by a petitioner before trial, at trial, on direct appeal (whether or not said petitioner actually took such an appeal), in an application for leave to appeal a conviction based on a guilty plea, in any habeas corpus or coram nobis proceeding actually instituted by said petitioner, in a prior petition under this subtitle, or in any other proceeding actually instituted by said petitioner, but was not in fact so made, there shall be a rebuttable presumption that said petitioner intelligently and knowingly failed to make such allegation.

**21.** Maryland Rule 8–131 concerns the scope of appellate review. Rule 8–131(a) provides in pertinent part,

[o]rdinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal.

State's waiver claim fails on its merits, as the factual predicate for the State's violations did not become apparent until Detective Marll's testimony during the evidentiary hearing on the post conviction petition, at which point Petitioner filed a timely supplement to his amended petition for post conviction relief to include the newly discovered *Brady* claims.[22] We agree with Petitioner's arguments.

## A. Factual Background

Petitioner's claims of *Brady* violations relate to the examination of Charles Johnson, and related corroboration testimony of Detective Marll, stemming from Johnson's meeting with Detectives Marll and Tincher on 23 November 1994. During that meeting, Johnson provided the detectives with non-public information concerning the murders of Ms. Johnson and Bradshaw that allegedly only the murderer would know. Johnson's statement indicated that he had not been promised any favors in exchange for the information in his statement. The statement was silent as to whether he asked for any favors.

On 14 December 1994, Petitioner's then trial counsel asked the State to provide all *Brady* material.[23] The State complied on 9 February 1995 by making available to Petitioner its file containing allegedly all relevant documents,[24] stating that "[a]t the present time, there is no information known to the State which is exculpatory, in any manner to the Defendant." Like-

---

**22.** Petitioner's counsel filed a Supplement to Amended Petition for Post Conviction Relief on 26 October 2000.

**23.** Specifically, Petitioner requested in his demand for discovery that "the State's Attorney disclose to the Defendant any material or information which tends to negate the guilt of the Defendant as to the offense charged or would tend to reduce the punishment therefor, or would be of assistance in impeaching the credibility of a State witness."

**24.** The State purported to provide "open file" discovery to Petitioner's counsel. While the precise definition of an "open file" policy may vary by jurisdiction, it is clear in this case that the prosecutor's use of the term meant to communicate that no discoverable matters were concealed in any way from Petitioner's counsel, noting that the State had provided Petitioner "a copy of the entire file of the State excluding internal documents and work product notes."

wise, in the State's 11 December 1995 response to Petitioner's motion to compel the State to comply with Md. Rule 4–263(a)(1),[25] the State reiterated its open file policy, explaining that "[t]he State has not put itself even in the position of determining what could be exculpatory," and furthermore claiming that its actions taken in this regard were *"well beyond the discovery requirements of Maryland Rule 4–263."* None of the documents in the State's files indicated that Johnson at any time sought a personal benefit for his cooperation, nor was there documentation indicating that there had been any unsuccessful attempts by the police to verify the information Johnson provided them at the 23 November 1994 meeting.

Charles Johnson first testified on 18 January 1996 at a suppression hearing regarding Petitioner's alleged jailhouse confession to Johnson. Johnson stated that his intention in contacting the police initially was to speak with them on Petitioner's behalf.[26] When asked if he requested a deal for the information, Johnson responded that he "didn't right out ask for a deal. . . . [He] didn't feel as though [the police] could offer [him] a deal." Petitioner's counsel nonetheless challenged Johnson's motive in contacting the police, relying on his known 13 January 1995 plea agreement with the State on a pending robbery charge. Johnson responded:

> [T]he only thing they have done is, well, I was found guilty on the charge that I was charged with, and as far as I know, I haven't been sentenced to anything, but I believe that my

---

**25.** Maryland Rule 4–263(a)(1) concerns discovery in circuit court, and in pertinent part states: "(a) **Disclosure Without Request.** Without the necessity of a request, the State's Attorney shall furnish to the defendant: (1) Any material or information tending to negate or mitigate the guilt or punishment of the defendant as to the offense charged. . . ."

**26.** Specifically, Johnson testified:
And I did tell [Petitioner] that I would speak with the officers more or less, it was more or less in his favor . . . if he didn't intend on [murdering Wanda Johnson], we were under the assumption that, you know, it wasn't a premeditated murder, that it happened as a result of panic or something of that nature.

armed robbery charge was reduced to a robbery, because I wasn't involved in the robbery.[27]

Similarly, at trial, Johnson testified that his sole motivation in contacting the police was to "speak on [Petitioner's] behalf that [Petitioner] didn't intentionally go in there with the intent or premeditation to kill Miss Johnson, that it happened because he panicked...." At the sentencing proceeding, Johnson denied Petitioner's counsel's accusation that he intended, from the outset, to lie about Petitioner's alleged confession in order to seek a deal on his pending charges.

Detective Marll denied at trial that any inducements had been offered to Johnson in exchange for the information. On direct examination, the prosecutor pointedly asked Detective Marll about any agreement between Johnson and the police:

[State:] Had you or Detective Tincher made any promises to Mr. Johnson concerning any information that he would provide you?

[Detective Marll:]   No, sir, we did not.

During Petitioner's sentencing hearing on 27 January 1998, Detective Marll was questioned on direct examination by the State about his interview with Johnson:

[State:] [D]uring the course of your conversations with [Charles Johnson] and then obtaining a written statement from Mr. Johnson, did he at any time ever ask you for any promises or favors in return for the information he was giving you?

[Detective Marll:]   No, sir, he did not.

Detective Marll also testified that the police had verified "each and every" non-public statement that Johnson had provided them at the meeting.

---

**27.** Johnson's robbery charge stemmed from his participation as the 'getaway' driver in the Wendy's robbery. *See supra* note 13. His testimony was that he was not present inside the Wendy's Restaurant at the time of the hold-up.

In its initial closing argument at trial, the State argued Johnson's credibility as a witness to the jury and his altruistic motives in contacting the police:

> Mr. Johnson told us the truth .... he came in here and told the truth because it was the right thing to do.

In the State's rebuttal closing, the prosecutor again emphasized Johnson's credibility as a witness, and reinforced the fact that he had no deal when he provided the police with his statement. The prosecutor stated:

> [Charles Johnson] walked in here and said the truth, he complied with his plea agreement .... he's telling you the truth.

> [I]t's untrue that anyone went to Charles Johnson and said, hey, let's cut you a deal so you can tell us some info. No, Charles Johnson went to the police and gave them information about Clarence Conyers. And there was no deal when he told the police, November the 23 rd of 1994 he gave them a seven-page statement about what he knew and what Clarence Conyers had told him. No deals at that time. He told them what he knew.

In the sentencing phase, the State commented again on Johnson's credibility as a witness, noting that Johnson's statements were "all true .... all accurate," and that he "came in [to court] and told [the jurors] the truth...."

Petitioner's counsel nonetheless argued, at both trial and sentencing, that Johnson was simply a lying jailhouse snitch, motivated by self-interest in obtaining his subsequent plea agreement with the State regarding his robbery charges. Petitioner underscored the benefit Johnson received from the State, which allowed him to reduce a potential, maximum jail term of 244 years on the nineteen count indictment for robbery, to a recommended sentence of one to six years, for, *inter alia*, his guilty plea to a one count misdemeanor charge of conspiracy to commit robbery, and his agreement to testify "truthfully" at Petitioner's trial.[28]

---

**28.** Charles Johnson was indicted on nineteen counts stemming from his involvement in the robbery of a Wendy's Restaurant. The charges

While Johnson's testimony was addressed by this Court in other contexts in the two prior direct appeals,[29] Petitioner never raised there a claim relative to the State's failure to disclose potential impeachment evidence concerning Johnson or the State's use of assertedly not fully accurate testimony.

On 2 October 2000, Detective Marll again testified at the post conviction hearing about his 23 November 1994 meeting with Johnson. On this occasion, however, Detective Marll indicated that indeed Johnson had queried the detectives about a possible deal. When Detective Marll informed Johnson that the police did not have the authority to commit to a deal, but would refer his inquiry to the State's Attorney's office, Johnson declined to sign his written statement, electing instead merely to initial the pages. Detective Marll also revealed, for the first time, that several statements Johnson provided the police during the 1994 meeting either were

included four counts of robbery, four counts of robbery with a deadly weapon, one count of conspiracy to commit robbery with a deadly weapon, one count of conspiracy to commit robbery, four counts of assault, one count battery, two counts of handgun violations, one count possession of a handgun, and one count theft. On 13 January 1995, Johnson signed a plea agreement with the State in which he agreed to plead guilty to a misdemeanor charge of conspiracy to commit robbery, for which the State would *nol pros* the balance of the charges and recommend a sentence of one to six years in accordance with sentencing guidelines for that crime. An additional term of the agreement required Johnson to "testify truthfully" and completely at Petitioner's trial as well as against his co-defendant on the robbery charges. Johnson ultimately served eighteen months at the Baltimore County Detention Center, and was released, for time served, two days after testifying at Petitioner's trial.

**29.** For example, this Court, in *Conyers II*, discussed whether Detective Marll's testimony, that he "knew upon hearing [certain statements] from [Charles] Johnson to be truthful ...," was improper opinion testimony as to the credibility of Johnson as a witness. *Conyers II*, 354 Md. at 153, 729 A.2d at 921. This Court held that Detective Marll was not offering an opinion as to Johnson's credibility as a witness, rather he was testifying as to the results of the verification efforts by the police regarding the information Johnson provided police concerning Petitioner's involvement in Wanda Johnson's and Bradshaw's murders. *Conyers II*, 354 Md. at 154, 729 A.2d at 921.

disproved subsequently by the police or were found by them to be unverifiable.

On 26 October 2000, Petitioner filed a timely supplement to the amended petition for post conviction relief raising, for the first time, the claim that the State denied Petitioner due process, and specifically, that (a) the State failed to disclose that Johnson had requested a benefit, that he refused to sign his statement absent a commitment to receive a benefit, and that Detective Marll agreed to pass along Johnson's request to the State's Attorney's office; (b) the State failed to correct Johnson's and Detective Marll's prior testimony denying that Johnson initiated an inquiry regarding receipt of a benefit for his cooperation at both the trial and sentencing proceedings; (c) the State failed to provide to the defense documentation in its possession indicating that there had been any unsuccessful attempts by the police to verify the non-public information Johnson provided in his 1994 meeting with police; and, (d) the State failed to correct Detective Marll's sentencing testimony that he had verified "each and every" non-public statement made by Charles Johnson during the 1994 meeting.

Petitioner's claims of *Brady* violations were addressed and argued on the merits in Petitioner's Memorandum of Law Supporting Post Conviction Relief, filed 4 December 2000, and the State's responsive Memorandum of Law Opposing Post Conviction Relief, dated 21 December 2000. The State did not argue waiver of the *Brady* claims during the post conviction proceedings, and, accordingly, the hearing judge did not address waiver in his opinion of 30 January 2001. The State first raised the waiver claim in its Response in Opposition to Application for Leave to Appeal from Denial of Post Conviction Relief in a Capital Case, filed with this Court on 19 April 2001.

### B. Analysis

Ordinarily, an argument not raised in the proceedings below is not preserved for appellate review. *See* Md. Rule 8–131(a). *See also Ware v. State,* 360 Md. 650, 692–93, 759 A.2d 764, 786 (2000) (holding that appellant's argument relating to the inad-

equacy of a jury instruction was waived where there had been "no timely objection" in the lower court), *cert. denied*, 531 U.S. 1115, 121 S.Ct. 864, 148 L.Ed.2d 776 (2001); *Conyers II*, 354 Md. at 148, 729 A.2d at 918 (acknowledging that Md. Rule 8–131(a) limits appellate review to those issues "raised in or decided by the trial court"); *Walker v. State*, 338 Md. 253, 262, 658 A.2d 239, 243 (1995) (stating that "[W]e ordinarily will not review an issue that was not presented to the trial court."); *State v. Bell*, 334 Md. 178, 187, 638 A.2d 107, 112 (1994).

■ This Court, in limited circumstances, however, may review an argument not made and preserved in the lower court. *See Bell*, 334 Md. at 188–89, 638 A.2d at 113 (noting that use of the word "ordinarily" contemplates circumstances where appellate review of issues not previously raised is appropriate); *Richmond v. State*, 330 Md. 223, 236, 623 A.2d 630, 636 (1993) (recognizing that there are limited circumstances in which an appellate court may consider arguments not raised in the court below). Appellate review under these exceptional circumstances is discretionary, not mandatory. *See Bell*, 334 Md. at 188, 638 A.2d at 113. *See also, e.g.*, Md. Rule 4–325(e) (conferring discretion on an appellate court acting "on its own initiative or on the suggestion of a party . . . [to] take cognizance of any plain error in the [jury] instructions, material to the rights of the defendant, despite a failure to object"); *Rubin v. State*, 325 Md. 552, 587, 602 A.2d 677, 694 (1992) (noting that "as the cases hold with respect to errors of law generally, an appellate court may in its discretion in an exceptional case take cognizance of plain error even though the matter was not raised in the trial court") (citation omitted); *Robeson v. State*, 285 Md. 498, 502, 403 A.2d 1221, 1223 (1979) (discussing exceptions to the general principle that an appellate court will not ordinarily consider an issue not previously raised).

■ We often have stated that the primary purpose of Rule 8–131(a) is " 'to ensure fairness for all parties in a case and to promote the orderly administration of law.' " *Bell*, 334 Md. at 189, 638 A.2d at 113 (quoting *Brice v. State*, 254 Md. 655, 661,

255 A.2d 28, 31 (1969) (alteration in original) (citation omitted)). The State had an opportunity to raise its waiver claim during the post conviction proceedings, but instead chose to argue Petitioner's *Brady* claims on the merits. As a result, the post conviction court did not address waiver in connection with these arguments. While this Court may decide, in its discretion and under exceptional circumstances, matters not raised in the proceedings below, the State's contention does not merit exceptional treatment here. Nor has the State referred us to any legal authority that would support exempting the State from any of the general waiver rules in the present case.

■ Moreover, the State's assertion that Petitioner's *Brady* claims were waived pursuant to Art. 27, § 645A(c)(2), is misguided. In pertinent part, § 645A(c)(2), states:

When an allegation of error *could* have been made by a petitioner before trial, at trial, on direct appeal (whether or not said petitioner actually took such an appeal), ... in a prior petition under this subtitle, or in any other proceeding actually instituted by said petitioner, but was not in fact so made, there shall be a rebuttable presumption that said petitioner intelligently and knowingly failed to make such allegation. (Emphasis added).

The fundamental question the State advances here is whether Petitioner's allegations of prosecutorial misconduct relating to the testimony of Charles Johnson have been waived by his failure to challenge the violations at trial or in the direct appeals. Petitioner argues that it is axiomatic that you "cannot waive what [you] could not reasonably know." We agree with Petitioner.

Inherent in the language of § 645A(c)(2) is the presupposition that an opportunity to raise the challenge existed at the time of the lower court proceeding. *See, e.g., Hunt v. State,* 345 Md. 122, 142, 691 A.2d 1255, 1265 (1997) (noting that "defense counsel's acceptance of the jury panel was sufficient to bar any subsequent objection thereto"); *Oken v. State,* 343 Md. 256, 271, 681 A.2d 30, 37 (1996) (recognizing that Oken's

counsel's decision not to raise the adequacy of the voir dire on appeal was a deliberate one); *Walker v. State,* 343 Md. 629, 647, 684 A.2d 429, 437–38 (1996) (noting that petitioner's post conviction challenge to a jury instruction was waived by his failure to raise it when it was given). *See also, e.g., Wyche v. State,* 53 Md.App. 403, 407, 454 A.2d 378, 380 (1983) (noting that if a right alleged to have been violated is a non-fundamental right, "waiver will be found if it is determined that the *possibility* existed for the petitioner to have raised the allegation in a prior proceeding, but he did not do so"). (Emphasis added). In each of these instances the factual basis for the defendant's claim was available to the defendant, but was not properly preserved. That is not the circumstance in the case *sub judice.*

Petitioner's trial and sentencing counsels, surmising from the known fact of the plea bargain, argued inferentially that Johnson's testimonial motivation, rather than the truth for its own sake, was entirely self-interest. The discrepancies between Johnson's testimony denying he requested a favor (when he did) and Detective Marll's corroborating testimony, however, were not revealed until Detective Marll's post conviction testimony. Similarly, there was no apparent discrepancy concerning police verification, *vel non,* of Johnson's 1994 statements regarding non-public information regarding the crimes until Detective Marll's post conviction testimony revealed otherwise.

The State cannot frustrate trial counsel's access to the factual basis for making a *Brady* claim, then cry foul when Petitioner does not raise such a challenge on direct appeal. This Court is satisfied from review of the relevant portions of the record that the factual predicate underlying Petitioner's *Brady* claims relating to the testimony and examination of Charles Johnson did not arise until the post conviction evidentiary hearing, at which point Petitioner properly raised these issues. Indeed, the State provides no evidentiary support for its bald allegation that Petitioner waived his claim under the waiver provision of § 645A(c)(2). Accordingly, we shall review Petitioner's *Brady* claims on the merits.

*The Brady Issues (I and VIII)*

A.  *Brady* Requirements

As indicated above, Petitioner's flagship contentions are that he was prejudiced by the State's violations of its constitutional obligations to Petitioner under *Brady*. We begin our analysis by identifying the essential elements Petitioner must establish to succeed on a *Brady* challenge. As we recently explained in *Wilson v. State,* 363 Md. 333, 345–47, 768 A.2d 675, 681–83 (2001):

> The Supreme Court made clear in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." [*Brady,* 373 U.S.] at 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215.  In order to establish a *Brady* violation, Petitioner must establish "(1) that the prosecutor suppressed or withheld evidence that is (2) favorable to the defense—either because it is exculpatory, provides a basis for mitigation of sentence, or because it provides grounds for impeaching a witness—and (3) that the suppressed evidence is material." Evidence that is obviously favorable must be disclosed even absent a specific request by the defendant.
>
> Impeachment evidence, as well as exculpatory evidence, is "evidence favorable to an accused."  [*C]f. Napue v. People of Ill.,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) (holding that the prohibition against the use of false testimony applies even when the evidence goes only to the credibility of the witness because the jury's assessment of credibility can be determinative of guilt or innocence).
>
> The failure to disclose evidence relating to any understanding or agreement with a key witness as to a future prosecution, in particular, violates due process, because such evidence is relevant to witness's credibility.  The Supreme Court explained in *Giglio* [*v. United States,* 405 U.S. 150, 154–55, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) ] that, when

the government depends almost entirely on the testimony of a key witness to establish its prima facie case and the witness's credibility, therefore, is an important issue, "evidence of *any* understanding or agreement as to a future prosecution would be relevant to his credibility...." *See id.* (emphasis added). This Court underscored the same point in *Ware* [*v. State,* 348 Md. 19, 702 A.2d 699 (1997) ] when we concluded that "the prosecutor's duty to disclose applies to *any* understanding or agreement between the witness and the State." *Ware,* 348 Md. at 41, 702 A.2d at 710. (emphasis in original).

The standard for measuring the materiality of the undisclosed evidence is strictest if it "demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury." In [*United States v.*] *Agurs,* [427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976) ] the Supreme Court explained that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." In cases where there is no false testimony but the prosecution nonetheless fails to disclose favorable evidence, the standard for materiality, in the language of the Supreme Court, is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." [*S]ee ... Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[3] Materiality is assessed by considering all of the suppressed evidence collectively. The question, therefore, "is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same," which is determined in reference to the sum of the evidence and its significance for the prosecution.

[3] This Court has interpreted the reasonable probability standard from *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80

L.Ed.2d 674 (1984), to mean a "substantial possibility that ... the result of [the] trial would have been any different." *State v. Thomas,* 325 Md. 160, 190, 599 A.2d 1171, 1185 (1992). *See [Thomas,* 325 Md.] at 190 n. 8, 599 A.2d at 1185 n. 8; *Bowers v. State,* 320 Md. 416, 426–27, 578 A.2d 734, 739 (1990).

(Some citations omitted).

Applying the above analysis in Conyers's case, we must determine whether (1) the State suppressed or withheld evidence that was (2) favorable to the Petitioner and (3) whether the suppressed evidence was material.

## B.   Charles Johnson's Request for a Benefit

### 1.   State Suppression

The State argues that the post conviction hearing judge correctly found that Charles Johnson did not seek a benefit in exchange for the *information* he provided the police on 23 November 1994; accordingly, so the argument goes, the State could not have suppressed evidence of such a request. For that same reason, the State contends the hearing judge correctly concluded that Johnson and Detective Marll testified accurately and truthfully in the lower court proceedings when they denied that Johnson requested a benefit in exchange for the incriminating information against Petitioner.

Moreover, the State asserts Johnson's receipt of a benefit, i.e., the plea agreement relative to the robbery charges, in exchange for his later *testimony,* was known by Petitioner.[30] The State invites this Court to accept the post conviction judge's rationale that reconciled Detective Marll's post conviction testimony with his prior testimony by drawing a meaningful distinction between Johnson's willingness to provide the police with the incriminating information in 1994, *gratis,* and his subsequent successful negotiation with the State for a benefit in exchange for his 1996 and 1998 testimony against Petitioner. We decline the invitation.

---

**30.**   Johnson's plea agreement with the State was in place less than two months following his meeting with police.

■ It is well settled that this Court will not disturb the factual findings of the post conviction court unless they are clearly erroneous. *See Wilson,* 363 Md. at 348, 768 A.2d at 683; *Oken,* 343 Md. at 299, 681 A.2d at 51; *Gilliam v. State,* 331 Md. 651, 672, 629 A.2d 685, 696 (1993). Finding that Charles Johnson did not seek a benefit in the course of his 1994 meeting with police, the post conviction hearing judge stated:

Charles Johnson willingly provided information to the police with no prearranged agreement or deal. He apparently elected not to sign the written statement he willingly provided in the hope that he could arrange an agreement with the State's Attorney's Office in exchange for his *testimony at trial.* Charles Johnson was telling the truth when he said that "he didn't right out ask for a deal [of the police]." He correctly didn't feel the police could offer a deal. Detective Marll was telling the truth that Charles Johnson didn't ask "for any promises or favors in return for the information" he gave to the police. This is verified by the fact that he did give the information to the police with no agreement or deal.

Charles Johnson did want an agreement in exchange for his "testimony." He knew and/or was told that the police could not accomplish that.

The only evidence which could refute the initial motivation is his subsequent act of securing an agreement to testify for the State in exchange for a benefit for him. This information was provided by the State to all counsel for the Petitioner and was the primary subject of cross-examination.

Having reviewed the entire record regarding the alleged *Brady* suppression of Johnson's full negotiations for a benefit, we find the post conviction court's factual findings are not supported by the record, and we disagree with its conclusions of law.

■ The State's duty to disclose exculpatory evidence as enunciated in *Brady* is to ensure that a defendant receives

a fair trial. *Brady,* 373 U.S. at 87, 83 S.Ct. at 1197, 10 L.Ed.2d 215 (noting that "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair."). *See also United States v. Bagley,* 473 U.S. 667, 675, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985) (stating that "[t]he *Brady* rule is based on the requirement of due process.... [T]he prosecutor is ... to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial...."). Evidence will be deemed to be suppressed within the meaning of *Brady* if it is " 'information which had been known to the prosecution but unknown to the defense.' " *Spicer v. Roxbury Corr. Inst.,* 194 F.3d 547, 557 (4th Cir.1999) (noting the prosecutor acknowledged withholding evidence pertaining to inconsistent statements of its key identification witness to defendant's counsel) (quoting *Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397, 49 L.Ed.2d 342); *Ware,* 348 Md. at 39, 702 A.2d at 709 (stating that the necessary inquiry is "whether the defendant knew or should have known facts that would have allowed him to access the undisclosed evidence").

There is no question that the State knew that Johnson was seeking a benefit when he met with police in 1994. Detective Marll's post conviction testimony revealed that Johnson asked what could be done for him, albeit *subsequent* to his providing the police with a written, but unsigned, statement of Petitioner's alleged confession to him. The following exchange took place between Petitioner's counsel and Detective Marll at the post conviction hearing:

[Counsel:] Did Mr. Johnson ask you or mention anything in any way in the first hour and a half of his interrogation about his pending charges?

[Detective Marll:] I don't recall.... It seems to me that once the written statement was done, obviously, because there was a question about Mr. Johnson not signing the bottom of the form that he brought up that basically he wanted something done in his behalf by the State's Attorney's Office, and that's why he initialed the form in our presence.

■ We have no doubt that Detective Marll understood the implications of Johnson's request, as Johnson refused to sign his statement without a commitment for a benefit, choosing instead only to initial the pages. In that regard, Detective Marll testified:

At that time, I asked if he would sign the bottom of the statement form, and he said he didn't want to, he didn't feel comfortable signing it, but he said he would put his initials there, and he did, he wrote them on each page in front of us and placed his initials on each line next to the signature block area, and at that time, we were done.

It is equally clear that Detective Marll ostensibly offered to act as an intermediary between Johnson and the State's Attorney's office. Detective Marll testified:

After these seven pages were done, what I asked Mr. Johnson to do was to review and sign each one of them, and that's when the question came up about his—he would have had—whatever charge it was that he had that he wanted to know what can be done for him.

And at the time, we said we don't make any deals, we can't make any promises. The only thing we can do is take the statement to the State's Attorney Office, and they can get in touch with your attorney and anything along that line can be done by them. We stay entirely out of it.

Facts known to the police will be imputed to the State for *Brady* purposes. *See Strickler v. Greene,* 527 U.S. 263, 280–81, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999) (noting the *Brady* rule "encompasses evidence 'known only to police investigators and not to the prosecutor' ") (quoting *Kyles v. Whitley,* 514 U.S. 419, 438, 115 S.Ct. 1555, 1568, 131 L.Ed.2d 490 (1995)); *Boone v. Paderick,* 541 F.2d 447, 451 (4th Cir.1976) (attributing the knowledge of the police to the Government, the Court noted, " '[t]he police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure.' ") (quoting *Barbee v. Warden,* 331 F.2d 842, 846 (4th Cir.1964)).

■ It is undisputed that the substance of Detective Marll's testimony concerning the commencement and course

of Johnson's negotiations for a benefit was withheld from Petitioner until the post conviction hearing. Petitioner's pretrial requests for disclosure of *Brady* material, discussed *supra*, failed to elicit any documentation concerning Johnson's negotiations for a deal. Petitioner reasonably relied upon the State's open file policy as fulfilling the prosecution's duty to disclose the evidence he requested. *See Strickler,* 527 U.S. at 283 n. 23, 119 S.Ct. at 1949 n. 23, 144 L.Ed.2d 286 (stating that "if a prosecutor asserts that he complies with *Brady* through an open file policy, defense counsel may reasonably rely on that file to contain all materials the State is constitutionally obligated to disclose under *Brady.*"). The reasonableness of Petitioner's reliance was confirmed by the State's statement that it had *"well"* exceeded the requirements of *Brady* by providing Petitioner with all pertinent portions of its files.

We shall not entertain the State's hair-splitting in honoring form over substance. The record demonstrates that Petitioner's counsel attempted, based on the plea bargain alone, to persuade the jury that Johnson sought a favor for his allegedly fabricated testimony regarding Petitioner's alleged confession.[31]  Petitioner's various counsel were understandably unsuccessful in uncovering on their own the full circumstances

---

31. The Dissent, at 616, suggests that it is "universally understood that plea bargaining constitutes favors," and therefore, when the jury was "informed of the plea agreement, it, impliedly, was informed that a give and take process [an exchange of favors] for Johnson's testimony had been undertaken and been consummated." Assuming that to be an accurate abstract generalization, the State, in this case, attempted to counter such a notion by implying, at both trial and sentencing, that Johnson received nothing more nor less in terms of a bargain on his pending charges than what was commensurate with his participation as the getaway driver in the Wendy's Restaurant robbery. In its closing at trial, the State claimed:

  We have this incredible exaggeration of what [Johnson's] participation was in [the Wendy's robbery], and the basis for this plea agreement.... We know that he was a getaway driver in a robbery, that's why he didn't know how many victims there were, he wasn't inside the place....

  We know that the sentencing guidelines for the crime that he plead guilty to are between one and six years incarceration. And what's

precipitating the ultimate plea bargain. The sole basis offered by the State, and accepted by the post conviction judge, for resisting disclosure of the full extent of the negotiations was the State's arbitrary and circumscribed interpretation of Petitioner's cross-examinations of Johnson and Detective Marll concerning the matter. Indeed, Johnson and Detective Marll nimbly sidestepped complete and accurate responses by interpreting the questions posed to them in terms of "promises or favors" in exchange for Johnson's 1994 "information," rather than for his later testimony. In effect, these witnesses intellectually bifurcated the pertinent course of events in order to make the nice distinctions offered at the post conviction hearing as explanations for why their earlier testimony was not incomplete or perhaps simply false.[32] The State's lack of

---

the State asking for? The sentencing guidelines of one to six years incarceration. He plead guilty to conspiracy to commit the crime of robbery, and that is supposed to be the motivation for him to walk in here and lie....

In its sentencing closing argument, the State said:

And this great deal that the defense tells you he got, he stated all these hundreds of years. Well, in fact, Mr. Charles Johnson had to plead guilty, did plead guilty to conspiracy to commit robbery, and the State recommended a sentence of one to six years, which is what the guidelines were, the regular guidelines for a person that committed that offense. For all of that, that man is going to come in and lie about a first degree murder in a death penalty case? So much for that great deal.

**32.** In describing the offense of perjury in *Brown v. State*, 225 Md. 610, 616, 171 A.2d 456, 458 (1961) (citations omitted), this Court said:

The offense consists in swearing falsely and corruptly, without probable cause of belief; not in swearing rashly or inconsiderately, according to belief. The false oath, if taken from inadvertence or mistake, cannot amount to voluntary or corrupt perjury.... That the oath is wilful and corrupt must not only be charged in the indictment, but must be supported on trial. An oath is wilful when taken with deliberation, and not through surprise or confusion, or a bona fide mistake as to the facts, in which latter cases perjury does not lie.

*See also* Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 435 (defining, in pertinent part, the crime of perjury as "[a]n oath or affirmation, if made willfully and falsely in any of the following cases ... all cases where false swearing would be perjury at common law....").

While we shall not find that the State offered perjured testimony, we cannot condone the *Brady* violations apparently employed to enhance the credibility of Johnson.

candor was never more apparent as when, at sentencing, the State pointedly asked Detective Marll if Johnson had "at any time" during the course of their conversations ever asked him for "any promises in return for the *information*" that he provided, eliciting Detective Marll's categorical response, "No sir, he did not." (Emphasis added).

It is clear to us that the State's and the witnesses' deceptive approach was intended to evade the thrust of Petitioner's questioning. We find the commencement of Johnson's negotiations leading up to the plea agreement for his testimony against Petitioner, and the fact that he declined to sign the written statement because no immediate commitment for a benefit was forthcoming, to be inseparable conceptually from his initially apprising the police of the incriminating information. After all, Johnson's unsigned, written statement would be of limited or no value to the State without his consistent in-court testimony.[33] We find that the evidence concerning

---

**33.** Absent Johnson's testimony at trial, the State would have been unable to offer his unsigned, written statement of 23 November 1994 as substantive evidence of Petitioner's guilt, as it does not fall within any exception to the Maryland Rules on hearsay, Rules 5–801–5–806.

On the other hand, in accordance with Md. Rule 5–802.1(a)(3), the initial portion of Johnson's handwritten statement recounting the facts surrounding Petitioner's alleged confession might be successfully admitted as substantive evidence of Petitioner's guilt if Johnson, called by the State as a witness and subject to cross-examination, testified inconsistently with this prior statement. Md. Rule 5–802.1 provides in pertinent part:

**Hearsay exceptions—Prior statements by witnesses.**

The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule: (a) A statement that is inconsistent with the declarant's testimony, if the statement was (1) given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding or in a deposition; (2) reduced to writing and signed by the declarant; or (3) recorded in substantially verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement. . . .

In *Stewart v. State,* 342 Md. 230, 674 A.2d 944 (1996), this Court observed in dicta that prior inconsistent, unsigned written statements are not admissible under Md. Rule 5–802.1(a)(3) as substantive evidence "unless they are recorded substantially verbatim by a reliable stenographer or electronic means contemporaneously with the making

Johnson's initial request for a benefit and his refusal to sign the written statement when such a benefit was not immediately forthcoming was within the exclusive control of the State, and the State's failure to disclose this evidence upon request consequently constituted a "suppression" within the meaning of *Brady.*

## 2. Evidence Favorable to the Petitioner

To succeed on a *Brady* claim, Petitioner also must establish that the suppressed evidence was favorable to his defense. As indicated above, favorable evidence encompasses not only exculpatory evidence, but also evidence that may be used to impeach the credibility of a witness. *See Wilson*, 363 Md. at 345–46, 768 A.2d at 681–82. The Court has recognized the importance of impeachment evidence, noting that " 'if disclosed and used effectively, [impeachment evidence] may make the difference between conviction and acquittal.' " *Spicer*, 194 F.3d at 556 (quoting *Bagley*, 473 U.S. at 676, 105 S.Ct. at 3380, 87 L.Ed.2d 481). *See also Strickler*, 527 U.S. at 282 n. 21, 119 S.Ct. at 1949 n. 21, 144 L.Ed.2d 286 (recognizing that *Brady's* disclosure requirements "extend to materials that, whatever their other characteristics, may be used to impeach a witness"). *Cf. Napue*, 360 U.S. at 269, 79 S.Ct. at 1177, 3 L.Ed.2d 1217 ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.").

---

of the statement," further noting that "an unsigned statement taken down in a police officer's 'shorthand' is not substantive evidence" under Md. Rule 5–802.1(a)(3). *Stewart*, 342 Md. at 238, 674 A.2d at 948. As the portion of Johnson's statement concerning Petitioner's alleged confession was transcribed in his own handwriting, this portion of the statement might have satisfied the reliability requirements of Md. Rule 5–802.1(a)(3), allowing its possible admission as substantive evidence. If Johnson took the stand and refused to testify, however, the State would be unable to introduce the statement as a prior inconsistent statement, as refusal to testify is not deemed "inconsistent" with prior testimony. *See Tyler v. State*, 342 Md. 766, 777, 679 A.2d 1127, 1133 (1996).

■ It is well established that the State's failure to disclose the existence of a plea agreement with a key witness violates *Brady* standards, because the terms of the agreement might provide evidence regarding the witness's motivation to testify. *See Giglio*, 405 U.S. at 154–55, 92 S.Ct. at 766, 31 L.Ed.2d 104; *Wilson*, 363 Md. at 348, 768 A.2d at 683; *Ware*, 348 Md. at 50, 702 A.2d at 714 (recognizing that evidence of a plea agreement between the State and a witness is "powerful impeachment evidence" that "enables a defendant to attack the motive or bias of a witness . . . ." and must be disclosed to the accused); *Marshall v. State*, 346 Md. 186, 198, 695 A.2d 184, 190 (1997) (recognizing that a jury is entitled to know the terms of a plea agreement between a State and its witness so that it may assess whether the witness's testimony "has been influenced by bias or motive to testify falsely"); *cf. Napue*, 360 U.S. at 270, 79 S.Ct. at 1177, 3 L.Ed.2d 1217 (holding that the failure of the prosecutor to correct the false testimony of a witness relating to the absence of an inducement by the State for his testimony was prejudicial for impeachment purposes).

Recently, under the dictates of *Brady*, this Court, in *Wilson v. State*, 363 Md. 333, 768 A.2d 675 (2001), reversed a petitioner's conviction where the State failed to disclose the specific terms of its written plea agreements with two key codefendant witnesses, even where the jury had been apprised of the existence of the agreements through the testimony of the State's witnesses. *Wilson*, 363 Md. at 356, 768 A.2d at 687. We rejected the State's argument that its disclosure was sufficient, determining that the specific terms of the written plea agreements were favorable to Wilson's impeachment strategy and should have been disclosed. *Wilson*, 363 Md. at 349, 768 A.2d at 683–84. This was particularly true, the Court noted, where the witnesses' testimony concerning the terms of the agreements were inaccurate, and were then further mischaracterized by the State in closing arguments. *Wilson*, 363 Md. at 356, 768 A.2d at 687. *Wilson* is instructive in the present case.

Here, while Petitioner and the jury were aware of the existence of Johnson's plea agreement in return for his testi-

mony, the State withheld arguably related circumstances leading up to its consummation, namely, that Johnson, indeed, requested a favor, and that he refused to sign his written statement absent such a commitment. This was evidence that disputed Johnson's later testimony (and the State's trial arguments), which information would have strengthened Petitioner's assertion that Johnson had fabricated Petitioner's alleged confession in an effort to garner a benefit on outstanding charges.

The State argues that Johnson's self-interest was "more than adequately" presented to the jurors, and that they were presented with a "full picture" of Johnson through his testimony. We disagree. Defense counsel was entitled to explore and argue from all of the pertinent evidence as to Johnson's bias and credibility. Suppression of this evidence deprived the jurors of a full opportunity to evaluate the credibility of Johnson's testimony, and Detective Marll's corroborating testimony, and deprived Petitioner of potentially valuable impeachment evidence. The difference in potential impeachment value of this information increased during the sentencing phase, as we discuss further *infra*, because of Johnson's position as the key witness to Petitioner's principalship in the murder of Wanda Johnson.

Similar to *Wilson*, the value of the suppressed information as impeachment evidence was confirmed by the State's efforts to conceal it from Petitioner. The State offered, without correction, Johnson's testimony asserting his altruistic motives in contacting the police and repeated denials of his solicitation of a *quid pro quo* for the information. The State persisted in this tact by placing a police detective on the witness stand to bolster indirectly Johnson's testimony, both as to motive in giving it and in substance. The State's conduct continued in its closing arguments, at trial and sentencing, in which it extolled Johnson's credibility as a witness, knowing its own sins of omission.

While it is true that Petitioner vigorously cross-examined Johnson in an attempt to discredit his testimony, and argued

by inference a link between Johnson's motive in coming forward and the plea agreement, that does not necessarily vitiate any error caused by the State's failure to disclose this impeachment evidence. *See Wilson*, 363 Md. at 351, 768 A.2d at 684 (stating that cross-examination of a witness regarding inducement "to testify does not substitute for adequate disclosure"); *Boone*, 541 F.2d at 451 (noting that "[n]o matter how good defense counsel's argument may have been, it was apparent to the jury that it rested upon conjecture—a conjecture which the prosecutor disputed."). *See also Martin v. State*, —— So.2d ——, ——, 2001 WL 1520631, 2001 Ala.Crim.App. Lexis 298, 21 (Ala.Crim.App. 2001) (likening defendant to a "fighter with one hand tied behind his back—the fact that he was able to land a few punches in cross-examination with one fist did not make the match a fair one"). Under the facts of this case, the State's failure to disclose the impeachment evidence violates *Brady* principles.

## 3. Material Evidence

Petitioner's final obstacle in establishing a *Brady* violation is materiality. As this Court explained in *Wilson*, discussed *supra*, there are two different materiality standards [34] that

---

**34.** In his dissent in *Strickler v. Greene*, 527 U.S. 263, 298–300, 119 S.Ct. 1936, 1956–57, 144 L.Ed.2d 286 (1999) (Souter, J., dissenting), Justice Souter provided an instructive review of the evolution in the Supreme Court of the materiality standard imposed by the *Brady* rule:

Brady itself did not explain what it meant by "material" (perhaps assuming the term would be given its usual meaning in the law of evidence, *see United States v. Bagley*, 473 U.S. 667, 703, n. 5, 105 S.Ct. 3375, 3394, n. 5, 87 L.Ed.2d 481 (1985) (Marshall, J., dissenting)). We first essayed a partial definition in *United States v. Agurs*, [427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)], where we identified three situations arguably within the ambit of *Brady* and said that in the first, involving knowing use of perjured testimony, reversal was required if there was "any reasonable likelihood" that the false testimony had affected the verdict. *Agurs*, [427 U.S.] at 103, 96 S.Ct. at 2397 (citing *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972), in turn quoting *Napue v. Illinois*, 360 U.S. 264, 271, 79 S.Ct. 1173, 1178, 3 L.Ed.2d 1217 (1959)). We have treated "reasonable likelihood" as synonymous with "reasonable possibility" and thus have equated materiality in the perjured—testimony cases with a showing that suppression of the

may be applied to the analysis of suppressed exculpatory evidence. The strictest, and more defendant-friendly, *Napue/Agurs* standard applies in those cases where " 'the prosecution's case includes perjured testimony and . . . the prosecution knew, or should have known, of the perjury.' " *Wilson,* 363 Md. at 346–47, 768 A.2d at 682 (quoting *Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397, 49 L.Ed.2d 342). The Supreme Court explained in *Agurs* that " 'a conviction obtained by the knowing use of perjured testimony is fundamentally unfair,' " accordingly, it " 'must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *Id.* (quoting *Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397, 49 L.Ed.2d 342). *See Napue,* 360 U.S. at 272, 79 S.Ct. at 1179, 3 L.Ed.2d 1217.

A different standard of materiality applies in those cases where there is no perjured testimony, but there is prosecutorial failure to disclose exculpatory evidence. Under the *Brady/Bagley* materiality standard, evidence will be deemed material if " 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the

---

evidence was not harmless beyond a reasonable doubt. *Bagley,* [473 U.S.] at 678–80, and n. 9, 105 S.Ct. at 3381–83, and n. 9 (opinion of Blackmun, J.). *See also Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 1721, 123 L.Ed.2d 353 (1993) (defining harmless-beyond-a-reasonable-doubt standard as no " 'reasonable possibility' that trial error contributed to the verdict"); *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) (same). In *Agurs,* we thought a less demanding standard appropriate when the prosecution fails to turn over materials in the absence of a specific request. Although we refrained from attaching a label to that standard, we explained it as falling between the more-likely-than-not level and yet another criterion, whether the reviewing court's " 'conviction [was] sure that the error did not influence the jury, or had but very slight effect.' " [*Agurs,*] 427 U.S. at 112, 96 S.Ct. at 2401 (quoting *Kotteakos v. United States,* 328 U.S. 750, 764, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)). Finally, in *United States v. Bagley,* [473 U.S. at 682, 105 S.Ct. at 3383–84], we embraced "reasonable probability" as the appropriate standard to judge the materiality of information withheld by the prosecution whether or not the defense had asked first. *Bagley* took that phrase from *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984), where it had been used for the level of prejudice needed to make out a claim of constitutionally ineffective assistance of counsel. . . .

proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome' " of the case. *Wilson,* 363 Md. at 347, 768 A.2d at 682 (quoting *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383, 87 L.Ed.2d 481 (opinion of Blackmun, J.)). *See also Kyles,* 514 U.S. at 433–34, 115 S.Ct. at 1565, 131 L.Ed.2d 490. This Court has interpreted the *Strickland* "reasonable probability" standard to mean a " 'substantial possibility that ... the result of [the] trial would have been any different.' " *Wilson,* 363 Md. at 347 n. 3, 768 A.2d at 683 n. 3 (quoting *State v. Thomas,* 325 Md. 160, 190, 599 A.2d 1171, 1185 (1992)). *See also Thomas,* 325 Md. at 190 n. 8, 599 A.2d at 1185 n. 8; *Bowers v. State,* 320 Md. 416, 426–27, 578 A.2d 734, 739 (1990). This standard applies to "the 'no request,' 'general request,' and 'specific request' cases of prosecutorial failure to disclose evidence favorable to the accused." *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383, 87 L.Ed.2d 481 (opinion of Blackmun, J.).[35] *See Ware,* 348 Md. at 48, 702 A.2d at 713 (noting that under *Bagley,* the Court "no longer distinguish[es] for purposes of determining the standard of materiality among cases in which the defense made a specific request as opposed to a general request or no request at all").

Petitioner asserts that the stricter standard of materiality enunciated in *Napue* applies under the facts of this case, arguing that the State affirmatively presented perjured testimony. Accordingly, Petitioner contends, a new trial, or at least a new sentencing, is required because there was a "reasonable likelihood that the false testimony could have affected the judgment of the jury." *Wilson,* 363 Md. at 347, 768 A.2d at 682 (citation omitted). Petitioner alternatively

---

**35.** In *Bagley,* Justice Blackmun found the *"Strickland* formulation of the *Agurs* test for materiality sufficiently flexible to cover the "no request," "general request," and "specific request" cases of prosecutorial failure to disclose evidence favorable to the accused...." *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383, 87 L.Ed.2d 481 (opinion of Blackmun, J.). *See also supra* note 34, discussing Justice Souter's dissent in *Strickler,* 527 U.S. at 298–300, 119 S.Ct. at 1956–58, 144 L.Ed.2d 286 (Souter, J., dissenting) (reviewing the evolution of the *Brady* rule).

argues that he is entitled to a new trial or sentencing because he meets the *Brady/Bagley* standard of materiality, as there was a "substantial possibility" that the outcome of the trial or sentencing would have been different had the withheld information been disclosed. *See Wilson*, 363 Md. at 347 n. 3, 768 A.2d at 683 n. 3. (citations omitted). While the *Napue* standard of materiality is not indicated in the present case, *supra* note 32, we are satisfied that Petitioner has met the stricter standard of showing materiality under *Brady/Bagley*. The record supports our conclusion that, had the evidence relating to Johnson's complete negotiations for a benefit been disclosed, there was a substantial possibility that the outcome would have been different.

We base our conclusion on several factors this Court has used to assess materiality for purposes of suppressed impeachment evidence. *See Wilson*, 363 Md. at 352–55, 768 A.2d at 685–87.[36] First, Johnson was a key State's witness as to Petitioner's principalship in Wanda Johnson's murder. Principalship directly governs Petitioner's eligibility for the death penalty. *See* Md.Code (1957, 1996 Repl.Vol., 1998 Supp.), Art. 27, § 413(e)(1) (restricting the death penalty only to persons convicted of first degree murder as a principal in the first degree). A principal in the first degree is " 'one who actually commits a crime, either by his own hand, or by [an] inanimate agency, or by an innocent human agent.' " *Gary v. State*, 341 Md. 513, 520, 671 A.2d 495, 498 (1996) (quoting *Johnson v. State*, 303 Md. 487, 510, 495 A.2d 1, 12 (1985) (alteration in original) (citation omitted)). Johnson's testimony concerning Petitioner's alleged confession affirmatively and

---

**36.** The Court in *Wilson* recognized several factors to which courts have looked to assess materiality for the purposes of suppressed impeachment evidence, which we apply in the instant case:

[T]he closeness of the case against the defendant and the cumulative weight of the other independent evidence of guilt, the centrality of the particular witness to the State's case, . . . whether and to what extent the witness's credibility is already in question, and the prosecutorial emphasis on the witness's credibility in closing arguments.

363 Md. at 352, 768 A.2d at 685 (citations omitted).

directly cast Petitioner, rather than his alleged accomplice (Bradshaw), as the actual perpetrator of her murder.[37]

Second, a determination of the relative significance of the suppressed evidence requires an understanding of the evidence that was presented at trial and sentencing. *See Wilson,* 363 Md. at 353, 768 A.2d at 685 (noting that the testimony of a codefendant witness provided the "only direct link between Petitioner and the crime"). The State disputes that Johnson's testimony at trial and sentencing was the only evidence of Petitioner's involvement or, as to Ms. Johnson's death, his principalship, respectively, in the murders. While that may be so, the other evidence to which the State refers is circumstantial. As indicated *supra,* the sentencing testimony, other than Johnson's, placed only Lawrence Bradshaw in the victim's home at the time of her murder. While there was circumstantial evidence adduced during the guilt/innocence portion of the trial that would permit a reasonable jury to conclude that Petitioner was a participant in her murder, it is less apparent that, absent belief of Johnson's testimony, the evidence would have been sufficient to find, beyond a reasonable doubt, Petitioner was the principal. If Johnson's testimony is to be believed, there are no inferences that need be drawn from the circumstantial evidence, either at trial or sentencing, in order to conclude that Petitioner was involved, or the shooter, in both murders. We should not be understood to hold, however, that the circumstantial evidence at trial and sentencing, exclusive of Johnson's testimony, necessarily was constitutionally insufficient for a reasonable jury to convict or render a sentence of death. We hold only that the taint of the *Brady* suppression matters on this record so undermines our confidence in the murder convictions and death sentence that a new trial is in order.

---

37. Judge Raker, in her dissent in *Conyers II,* recognized Charles Johnson as the State's primary witness on principalship, noting that "his credibility was central to the question of whether [Petitioner] was eligible for the death sentence." *Conyers II,* 354 Md. at 204, 729 A.2d at 948 (Raker, J., dissenting).

We reject the State's argument that the jury was provided with a "full picture" of Johnson through the testimony at both trial and the sentencings, referring to vigorous efforts by Petitioner's lawyers to portray Johnson as a jailhouse snitch out to get a deal. For the reasons discussed *supra*, we cannot say that if the jury was informed of the totality of the circumstances leading up to Johnson's ultimate plea agreement, there would not be a substantial possibility that the outcome would have been different had the withheld information been disclosed. *See Wilson*, 363 Md. at 353, 768 A.2d at 686 (noting that Wilson's trial counsel's attempt to cross-examine the State's key witnesses "was far less effective than it would have been" had he possessed the written agreements that specified the terms).

Finally, the State was an active participant in the 'smoke and mirrors' effort to mislead the Petitioner and jury as to the full circumstances preceding and precipitating Johnson's plea agreement. As previously noted *supra*, the prosecutor at sentencing expressly asked Detective Marll if Johnson had "at any time ever ask[ed][him] for any promises or favors in return for the information he was giving [him]," deliberately eliciting Detective Marll's denial. In closing argument at trial, the prosecutor trumpeted Johnson's version of why he contacted police by claiming Johnson told the truth "because it was the right thing to do." In both proceedings, the State emphasized Johnson's credibility as a witness. The importance of Johnson's credibility was evidenced by the State's efforts to argue his credibility in its last words to the jury. *See Wilson*, 363 Md. at 355, 768 A.2d at 687 (recognizing that "the 'likely damage' of the State's suppression of evidence in this case 'is best understood by taking the word of the prosecutor . . . during closing argument.' ") (quoting *Ware*, 348 Md. at 53, 702 A.2d at 715 (citations omitted)).

Applying the final test of materiality pertinent to these facts, we conclude that the State suppressed material impeachment evidence of Johnson's negotiations for a benefit. Accordingly, we reverse, based on the *Brady* claims, the lower court's judgment denying Petitioner post conviction relief.

We remand this case to the Circuit Court for Wicomico County for a new trial. We shall not reach Petitioner's remaining issues.

JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR A NEW TRIAL; COSTS TO BE PAID BY WICOMICO COUNTY.

Dissenting opinion by CATHELL, J. in which WILNER, J., joins

I respectfully dissent. The majority's opinion in this third examination of Conyer's conviction (*Conyers III,* I suppose) is a result looking for justification that, in actuality, does not exist.

The majority's reversal is based solely on the *Brady*[1] issue. It does not address the remaining issues (other than those relating to waiver with which I do not take issue). The majority states:

"[W]e must determine whether (1) the State suppressed or withheld evidence that was (2) favorable to the Petitioner and (3) whether the suppressed evidence was material."

I agree that if the evidence of Johnson's attempts to obtain favorable treatment in return for his testimony had been suppressed by the State, it was both favorable to the petitioner and material. The problem is, regardless of the majority's massive dumping of legal authority in its opinion and the discussion of perjury by the majority in a footnote, that the evidence was not suppressed or withheld in the first instance.

I have no dispute about the application of *Brady.* The extensive discussion of that case and its progeny in the majority's opinion serves primarily to obfuscate the weakness of its factual determination in the case. The majority's reversal is based not upon the law but upon its interpretation of the facts.

---

1. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

What is clear is that the purpose of the whole line of *Brady* cases is to insure that the trier of fact has before it any material impeachment (in this case) evidence. The impeachment evidence in this case was that Johnson, the witness at issue, received benefits for his testimony by way of a favorable plea bargain in respect to unrelated charges he was facing.

The majority states:

"Here, while Petitioner and the jury were aware of the existence of Johnson's plea agreement in return for his testimony, the State withheld arguably related circumstances leading up to its consummation, namely, that Johnson, indeed, requested a favor, and that he refused to sign his written statement absent such a commitment."

The favor Johnson requested was the plea agreement he received from the State and that plea agreement was made known to the jury. It is almost, I would suggest, universally understood that plea bargaining constitutes favors. Additionally, the very use of the general term "bargain" implies a give and take procedure where things are withheld and other things offered; some are accepted, some are rejected. When the jury was informed of the plea agreement, it, impliedly, was informed that a give and take process for Johnson's testimony had been undertaken and been consummated.

Additionally, the majority's reasoning is, in my view, sophistic in nature. Parsed of extraneous material, the majority is holding that because the detective's and Johnson's testimony about their prior communications was the *type* of testimony that could tend to obscure the existence of a beneficial plea bargain for Johnson on his unrelated charges, the case must be reversed under *Brady,* even though the beneficial plea bargain was, in fact, fully disclosed to the jury. The jury was fully apprised of the possible motive of Johnson to fabricate his testimony.

The purpose of the *Brady* holding (as applied in the impeachment context) is to insure that the jury is made aware of the motive for fabrication on the part of the witness, not to mandate that every nuance of the process from which the

motive to fabricate originates be remembered and/or disclosed.

Had Johnson's plea bargain not been disclosed to the jury, the dictates of the *Brady* line of cases would not have been met and I would join the majority. In my view, however, the requirements of *Brady* were met.

The majority does not address the other issues. Nonetheless, were I writing for the majority of the Court, I would affirm on all issues presented.

Judge WILNER has authorized me to state that he joins in this dissent.